*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



★ ★ ★ ★ ★ ★

# OPINION

No. 04-09-00266-CR

Tomas A. **BARRERA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2008-CRN-434-D1
Honorable Jose A. Lopez, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:       Sandee Bryan Marion, Justice
               Phylis J. Speedlin, Justice
               Marialyn Barnard, Justice

Delivered and Filed: June 16, 2010

AFFIRMED AS REFORMED

Tomas Barrera appeals his convictions for conspiracy to commit aggravated kidnapping and engaging in organized criminal activity. We overrule Barrera's issues on appeal and affirm the trial court's judgment. We reform the judgment, however, to correct the misnumbering of the counts such that the conviction and 15-year sentence for criminal conspiracy is designated as Count II and the conviction and 55-year sentence for engaging in organized criminal activity is designated as Count III.

### FACTUAL AND PROCEDURAL BACKGROUND

On or about December 21, 2006, Julian Adrian Serrano, a known hit man for a Mexican drug cartel, was shot and killed inside his mobile home in Laredo, Texas. Serrano suffered a single gunshot wound to his torso, with the bullet entering his lower right back and exiting his left front chest. Police found a .40 caliber bullet in a blanket on a couch near Serrano's body, and a plastic baggie of marihuana on the floor by the front door. Three days later, on December 24, 2006, the FBI arrested three men in a white Ford Explorer who were transporting a load of marihuana in nearby Jim Hogg County. The FBI confiscated several prepaid disposable Nextel phones from the three men, Diego Pequeno, Jr., Jose Luis Ramiro Navarro, and Jose Nunez Sanchez. A few months later, when Navarro was being debriefed by the FBI, he volunteered information about his participation in an attempted kidnapping that resulted in a murder in Laredo during December 2006. The FBI contacted Laredo Police Detective Robert Garcia with the information. Garcia downloaded the contact lists from the seized Nextel phones and subpoenaed the associated records; he analyzed and cross-referenced the phone records and contact lists to highlight the most frequent communications around December 20 and 21, 2006. Garcia was able to determine the identities of Navarro's frequent contacts and in turn obtained subpoenas for their phone records. Garcia's investigation ultimately led to the arrest of Barrera, along with several other members of the Texas Syndicate, a criminal gang. Two of the men, Navarro and Sixto Salinas (nicknamed "Sixto"), testified at trial as accomplice witnesses stating that Barrera was the sillon, or "chair," of the Laredo cell of the Texas Syndicate, and had supervised a plan to kidnap Serrano using a deadly weapon and to deliver him alive to the Zetas cartel in Nuevo Laredo, Mexico. Navarro and Sixto testified the aggravated kidnapping went awry when Serrano answered the door but then ran back inside his home, causing

one of the other participants, Juan Manuel Marquez-Rodriguez (nicknamed "Pugs"), to shoot once at Serrano to stop him from fleeing. The gunshot proved to be a fatal wound and Serrano died.

Barrera, along with Navarro and Sixto, as well as Pugs and Pequeno, plus five other men, were all indicted for conspiracy to commit aggravated kidnapping (Count Two) and engaging in organized criminal activity (Count Three). Pugs was also indicted for the murder of Serrano (Count One). Some of the co-defendants pled guilty. Barrera's case was severed from the other co-defendants' cases. After a one-week trial, the jury found Barrera guilty on both counts. The court sentenced Barrera to 15 years' imprisonment on the conspiracy conviction, and 55 years' imprisonment on the organized criminal activity conviction, with the sentences to run concurrently.

On appeal, Barrera presents nine issues involving double jeopardy, legal and factual sufficiency of the evidence, amendment and reading of the indictment, misnumbering of the counts in the jury charge, comments by the prosecutor, and admission of evidence. We will address each issue in turn.

## DOUBLE JEOPARDY

We begin by addressing Barrera's issue concerning double jeopardy. Barrera argues the offenses of conspiracy to commit aggravated kidnapping and engaging in organized criminal activity arose out of a single incident and constitute the same offense for double jeopardy purposes; therefore, his constitutional rights were violated when he received multiple punishments for the same offense. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 14; *Saenz v. State*, 166 S.W.3d 270, 272 (Tex. Crim. App. 2005) (double jeopardy clause prohibits multiple punishments for the same offense).

A person commits criminal conspiracy if "with intent that a felony [aggravated kidnapping] be committed . . . he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense [aggravated kidnapping]; and *he or one or more of them performs an overt act* in pursuance of the agreement." TEX. PENAL CODE ANN. § 15.02(a) (Vernon 2003) (emphasis added).

As applicable to this case, a person commits the offense of engaging in organized criminal activity if "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person *commits or conspires to commit* . . . aggravated kidnapping . . . ." TEX. PENAL CODE ANN. § 71.02(a)(1) (Vernon Supp. 2009) (emphasis added). Barrera was charged with engaging in organized criminal activity by "conspiring to commit" aggravated kidnapping. The statute defines the phrase "conspires to commit" as meaning that the person "agrees with one or more persons that . . . one or more of them engage in conduct that would constitute the offense [aggravated kidnapping] and *that person and one or more of them perform an overt act* in pursuance of the agreement." TEX. PENAL CODE ANN. § 71.01(b) (Vernon 2003) (emphasis added).

In *Barber v. State*, the Court of Criminal Appeals explained the main difference between criminal conspiracy and organized criminal activity, stating:

> A person may be guilty of criminal conspiracy by doing nothing more than agreeing to participate in the conspiracy, as long as another conspirator commits some overt act in furtherance of the conspiracy. But to commit the offense of engaging in organized criminal activity, the actor must not only agree to participate but must *himself perform some overt act* in pursuance of that agreement. Guilt requires two ingredients: (1) intent to participate in a criminal combination, and (2) the

> defendant's performing some act, not necessarily criminal in itself, in furtherance of the agreement. (emphasis added).

*Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988).

Barrera contends that conspiracy to commit aggravated kidnapping and engaging in organized criminal activity through "conspiring to commit" aggravated kidnapping are the same offense for double jeopardy purposes because criminal conspiracy is a lesser included offense of engaging in organized criminal activity. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Parrish v. State*, 869 S.W.2d 352, 354 (Tex. Crim. App. 1994) (under *Blockburger* "same elements" test, greater inclusive and lesser included offenses are generally the "same offenses" for double jeopardy purposes); *Quintanilla v. State*, 40 S.W.3d 576, 579 (Tex. App.—San Antonio 2001, pet. ref'd).

In a multiple-punishments-in-a-single-prosecution analysis under the Double Jeopardy Clause, two offenses may be the "same" if one is a lesser-included offense of the other, or if the two offenses are defined under distinct statutory provisions but the legislature has made it clear only one punishment is intended. *Littrell v. State*, 271 S.W.3d 273, 275-76 (Tex. Crim. App. 2008). "Sameness in this context is a matter of legislative intent." *Id.* at 276. Just because two offenses arising from a single incident are considered the "same" under *Blockburger*, that does not end the double jeopardy analysis; we must consider legislative intent. *Garza v. State*, 213 S.W.3d 338, 351-52 (Tex. Crim. App. 2007) (in context of multiple punishments arising from single prosecution, *Blockburger* test does not trump "clearly expressed legislative intent"). In the organized crime statute, the legislature has specifically authorized conviction and punishment for both engaging in organized criminal activity and for any of the underlying offenses listed in section 71.02(a). *Id.* at 352. Section 71.03(3) expressly states that it is not a defense to prosecution under section 71.02 that

"a person has been charged with, acquitted, or convicted of any offense listed in Subsection (a) of Section 71.02." TEX. PENAL CODE ANN. § 71.03(3) (Vernon 2003). In *Garza*, the Court of Criminal Appeals construed section 71.03(3) as a clear legislative expression of intent that defendants charged with both organized criminal activity and commission of an underlying offense may be punished for both, at least in the same proceeding, "notwithstanding their 'sameness.'" *Garza*, 213 S.W.3d at 352; *see De La Fuente v. State*, 264 S.W.3d 302, 315-316 (Tex. App.—San Antonio 2008, pet. ref'd).

Section 71.02(a) provides two means by which a defendant may engage in organized criminal activity – by *either committing or conspiring to commit* the underlying offense. TEX. PENAL CODE ANN. § 71.02(a). *Garza* confirmed that punishment for both engaging in organized criminal activity and committing the underlying offense is permitted, and in fact intended, under the statutory scheme. *Garza*, 213 S.W.3d at 352. Under *Garza*, it is clear that Barrera could be punished for both the offense of engaging in organized criminal activity by committing aggravated kidnapping and the separate offense of aggravated kidnapping without violating the Double Jeopardy Clause. *Garza*, 213 S.W.3d at 352. Barrera argues that because the means by which he was charged with engaging in organized crime was by "conspiring to commit" aggravated kidnapping, instead of by "committing" it, punishment for both organized criminal activity and the separate offense of criminal conspiracy violates double jeopardy. We disagree. Section 71.02(a) plainly provides two alternate means of engaging in organized criminal activity, by *either committing or conspiring to commit* the underlying offense. Applying *Garza*'s reasoning to the "conspiring to commit" means of committing organized criminal activity leads to the conclusion that punishment for that offense as well as for a criminal conspiracy to commit the underlying offense is also permitted, and was in fact contemplated

by the legislature. *See id.; see also Nichols v. State*, 653 S.W.2d 768, 770-71 (Tex. Crim. App. [Panel Op.] 1981) (phrase "conspires to commit" in section 71.02(a) does not refer to the offense of criminal conspiracy defined in section 15.02, but instead refers to statutory definition of "conspires to commit" as set forth in section 71.01(b) of Penal Code). It would be illogical for us to apply *Garza*'s analysis to only one of the two statutory means of engaging in organized criminal activity. We hold Barrera's conviction and punishment for both the offense of engaging in organized criminal activity and the offense of criminal conspiracy do not violate the Double Jeopardy Clause. Barrera's double jeopardy challenge is overruled.

### INDICTMENT

With respect to the amended indictment, Barrera argues his convictions are void because there is no signed order granting the State's motion to amend, the amended indictment was not returned by a grand jury, and it failed to properly charge him with commission of an offense. Barrera also asserts the court erred in permitting the prosecutor to read the indictment to the jury "in a way other than the way it appeared in its written form."

### *Amendment of Indictment*

As to Barrera's argument that the amended indictment was faulty because it was not returned by the grand jury, it is without merit. Article 28.10(a) provides that an indictment may be amended as to a matter of form or substance at any time before trial commences, upon notice to the defendant. TEX. CODE CRIM. PROC. ANN. art. 28.10(a) (Vernon 2006). Upon the defendant's objection or request, however, the court must allow the defendant at least 10 days to respond to the amended indictment. *Id.* Finally, if an amendment charges an additional element or different offense, or otherwise prejudices the defendant's substantial rights, the indictment may not be amended over a

defendant's objection. TEX. CODE CRIM. PROC. ANN. art. 28.10(c) (Vernon 2006); *see Auldridge v. State*, 228 S.W.3d 258, 260 (Tex. App.—Fort Worth 2007, pet. ref'd) (requirements of article 28.10 are triggered only when substance of indictment is amended, and do not apply to non-substantive alterations). Permitting the State to make amendments to an indictment that do not charge an additional or different offense does not deprive the defendant of his right to be tried on an indictment returned by a grand jury. *Riney v. State*, 28 S.W.3d 561, 566 (Tex. Crim. App. 2000) (signature of grand jury foreperson on amended indictment is not required); *Young v. State*, 776 S.W.2d 673, 676 (Tex. App.—Amarillo 1989, no pet.).

Here, the original indictment was returned on June 17, 2008. It alleged three counts: Count I (Murder), Count II (Conspiracy to Commit Aggravated Kidnapping), and Count III (Organized Criminal Activity). Barrera was named only in Counts II and III. On July 18, 2008, Barrera filed a motion to quash Count I based on misjoinder of parties, and to quash Count II for failing to allege an offense in clear and concise language; he did not obtain a ruling on the motion to quash. On October 30, 2008, the State filed a motion to amend the indictment. The motion restated all three counts, as amended, in their entirety. The amendment changed some of the language in Counts II and III to track the applicable statutes, and added a party liability theory to Count III, but did not charge an additional element or different offense.[1] At a pretrial hearing on November 4, 2008, the State brought its motion to amend the indictment to the trial court's attention, explaining that the substance of the charges remained unchanged. Co-counsel for Barrera indicated he had not yet had

---

[1] The law of parties need not be pled in an indictment. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005).

an opportunity to review the motion to amend, but made no other objection to the amendments. The trial court postponed its ruling, stating that Barrera would be given an opportunity to review the amendments and to file a motion to quash, if he so chose. The court noted, however, that the amendment was filed sufficiently in advance of the scheduled trial setting to be permissible under the statute. *See* TEX. CODE CRIM. PROC. ANN. art. 28.10(a). Barrera never made a motion to quash the amended indictment. The record clearly shows that Barrera had actual notice of the nature of the State's allegations that he committed the offenses of conspiracy and organized criminal activity, and their essential elements, well in advance of trial. Barrera has not shown any surprise or prejudice to his substantial rights stemming from the pre-trial amendments to the indictment. *See Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009) (pre-trial amendment of indictment to add phrase "during the same criminal transaction" did not charge defendant with additional element or different offense, and thus did not violate his substantial rights, where original indictment charged him with capital murder by shooting his ex-girlfriend and her daughter and record showed defendant had worked on his capital murder defense for months).

Finally, while the record does not contain a signed order granting the State's motion to amend the indictment, it is clear from the reporter's record that the February 2009 trial was held on the amended indictment, without objection by Barrera. The trial court, prosecutor, and defense counsel all referred to the amended version of the indictment at the beginning of trial and throughout trial. The prosecutor read the amended indictment into the record before the jury and Barrera entered his

plea of "not guilty" to the amended indictment without raising an objection.[2] The court's jury charge

tracked the amended indictment and the jury rendered its verdict on the amended indictment.

Moreover, Barrera never filed a motion to quash the amended indictment and did not object to

proceeding to trial based on the amended indictment. It is clear that Barrera had actual notice of the

amendments to the indictment well in advance of trial, never objected to the amendments, and was

tried and convicted on the amended indictment. The record as a whole in this particular case shows

that an effective amendment to the original indictment was made with approval of the trial court.

*See* TEX. CODE CRIM. PROC. ANN. art. 28.11 (Vernon 2006) (amendments to indictment shall be

made with leave of court); *see Riney*, 28 S.W.3d at 566 (noting that *Ward v. State*, 829 S.W.2d 787,

793 (Tex. Crim. App. 1992), continues to stand for the proposition that "[n]either the motion [to

amend] itself nor the trial judge's granting thereof is an amendment; rather the two comprise the

authorization for the eventual amendment of the charging instrument pursuant to Article 28.10");

*see also Aguilera v. State*, 75 S.W.3d 60, 64 (Tex. App.—San Antonio 2002, pet. ref'd) (holding

written order granting State's motion to amend indictment, and fully reproducing language of

indictment as amended, constituted an "effective amendment" to the indictment); *Valenti v. State*,

49 S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.) (physical interlineation on written order

granting motion to amend that reproduced language of original indictment was effective as

---

[2] Before the prosecutor read the indictment, Barrera did object to what he termed "a new amendment" to the indictment, which was the prosecutor's proposal to omit the reading of the co-defendants' names from the charging portion of Counts II and III based on the fact that Barrera had been severed for trial. Barrera objected that it would create the impression he was the only one indicted. However, at no time did Barrera object to proceeding on the amended indictment as it was reproduced in the State's motion to amend. To the extent Barrera complains about the "new amendment" omitting the co-defendants' names, it is without merit as the deletion of the names was proper in light of Barrera's severance. *See Jimenez v. State*, No. 04-06-00435-CR, 2009 WL 1789238, at *2 (Tex. App.—San Antonio June 24, 2009, pet. ref'd) (omission of severed co-defendants' names from reading of indictment was proper, and mistaken reference to uncharged individual's name in reading of indictment was surplusage and harmless).

amendment); *cf. Serna v. State*, 69 S.W.3d 377, 380 (Tex. App.—El Paso 2002, no pet.) (holding indictment was not effectively amended where amended indictment was not contained in clerk's record, was never read into the record, and defendant made very specific objections to amendments).

### *Sufficiency of Indictment*

With regard to Barrera's second argument, he asserts the indictment failed to charge him with an offense in Counts II and III because neither count contained an allegation that Barrera himself committed an overt act. Because it is a question of law, we review the sufficiency of an indictment *de novo*. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). We first determine whether the indictment was specific enough to inform the defendant of the nature of the alleged criminal conduct so that he may prepare a defense. *Id.*; *Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009). If notice was sufficient, that ends the inquiry; if not, we must assess the impact of the deficient notice on the accused's ability to prepare a defense, in light of the record, to determine whether reversal is required. *Adams v. State*, 707 S.W.2d 900, 903 (Tex. Crim. App. 1986).

With respect to Count II alleging a conspiracy to commit aggravated kidnapping, it was not required that the State allege or prove that Barrera himself actually committed an overt act. *See* TEX. PENAL CODE ANN. § 15.02(a)(1),(2) (providing that a person commits criminal conspiracy by agreeing with one or more persons that they *or* one or more of them will engage in conduct constituting the offense); *Barber*, 764 S.W.2d at 235. To the extent that Barrera argues the alleged overt act by Pugs, *i.e.*, shooting Serrano, was not "in pursuance of the agreement" to kidnap Serrano, that argument is addressed under legal and factual sufficiency of the evidence.

With respect to Count III alleging organized criminal activity, the State was required to allege and prove that Barrera himself committed an overt act in pursuance of the agreement. *See Barber*,

764 S.W.2d at 235. As explained below, the State met that requirement by alleging that Barrera's overt act consisted of promoting or assisting in the commission of the offense (the aggravated kidnapping). As discussed, *supra*, section 71.02(a) provides that a person engages in organized criminal activity by having the requisite intent[3] and by either committing one of the designated offenses or conspiring to commit one of the offenses, *i.e.*, by agreeing with one or more persons that they would engage in conduct constituting the offense, **and** that person **and** one or more of them performed an overt act in pursuance of the agreement. TEX. PENAL CODE ANN. § 71.01(b) (definition of "conspires to commit") (emphasis added); *Id.* § 71.02(a); *Barber*, 764 S.W.2d at 235. Count III of the amended indictment alleged that Barrera engaged in organized criminal activity by **conspiring to commit** aggravated kidnapping. The amended indictment incorporated the statutory definition of "conspires to commit" by alleging that Barrera and the other co-defendants, with the requisite intent, entered into an agreement that one of them (Marquez-Rodriguez a/k/a "Pugs") would engage in conduct constituting aggravated kidnapping, and Pugs performed an overt act in pursuance of the agreement, to wit: he shot the victim with a firearm. As to the requisite overt act performed by Barrera himself, the amended indictment incorporated a party liability theory by alleging that Barrera "act[ed] with the intent to promote or assist the commission of the offense of aggravated kidnapping by soliciting, encouraging, directing, aiding or attempting to aid the other person to commit the offense of aggravated kidnapping . . . ." *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003)

---

[3] The requisite intent for engaging in organized criminal activity is "the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang." TEX. PENAL CODE ANN. § 71.02(a). A "combination" is defined as "three or more persons who collaborate in carrying on criminal activities . . . ." TEX. PENAL CODE ANN. § 71.01(a). A "criminal street gang" means "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." TEX. PENAL CODE ANN. § 71.01(d). The amended indictment alleged both a combination and a criminal street gang, in the disjunctive. Barrera does not challenge the portion of the indictment alleging the requisite intent.

(person is criminally responsible for offense committed by conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense"). The Court of Criminal Appeals has determined that acts amounting to liability as a party may be used to meet the defendant's overt act element for the offense of engaging in organized criminal activity. *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003). Thus, Count III of the amended indictment properly alleged that Barrera himself committed an overt act in pursuance of the agreement by alleging that he "solicited, encouraged, directed, aided or attempted to aid" in the commission of the aggravated kidnapping. *See id.* ("[B]ecause the 'overt act' element of organized criminal activity need not be criminal in itself, acts that suffice for party liability–those that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense–would also satisfy the overt act element of section 71.02"). The face of the amended indictment provided Barrera with sufficient notice of the particular offense with which he was charged, including the particular overt acts which he committed. We conclude Barrera's challenges to the indictment are without merit.

### CRIMINAL CONSPIRACY

Barrera next argues the trial evidence was insufficient to support his conviction of conspiracy to commit aggravated kidnapping. Specifically, Barrera contends the accomplice witness testimony was uncorroborated and, even if corroborated, the trial evidence was legally and factually insufficient to prove all the alleged elements of conspiracy. Although Barrera phrases his challenge to corroboration of the accomplice testimony as a traditional sufficiency challenge, it is reviewed under a different standard discussed below. A separate legal and factual sufficiency analysis follows.

As noted, *supra*, the elements of criminal conspiracy applicable to this case are:

(1) intent that a felony be committed;
(2) agreement with one or more persons that one or more of them engage in conduct that would constitute the felony offense; and
(3) the defendant **or** one or more of them performs an overt act in pursuance of the agreement.

TEX. PENAL CODE ANN. § 15.02(a) (emphasis added). The statute expressly provides that the agreement may be inferred from the acts of the parties. *Id.* § 15.02(b). The key element of a conspiracy is the agreement to commit an offense; there is no requirement that the object offense actually be committed. *McIntosh v. State*, 52 S.W.3d 196, 200-01 (Tex. Crim. App. 2001). The conspirators are held criminally liable for the *agreement* to commit the offense. *Id.* at 201. However, if the object offense is actually committed, the statute provides that fact is no defense to prosecution for the conspiracy. TEX. PENAL CODE ANN. § 15.02(c)(5). The conspiracy offense is one category lower than the most serious felony that is the object of the conspiracy. *Id.* § 15.02(d).

Here, Barrera was charged with criminal conspiracy by agreeing that an aggravated kidnapping would be committed. Count II of the amended indictment alleged:

[O]n or about the 21st day of December A.D. 2006 . . . Tomas Barrera . . . did then and there, with intent that aggravated kidnapping, a felony, be committed, agree with Juan Manuel Marquez-Rodriguez, Jose Luis Romeo [sic] Navarro, Sergio Oslan Rivera Tejada, Raul Javier Munoz, Jesus Alejandro Campos, Jose M. Nunez-Sanchez, . . . Sixto Salinas, and Rodolfo Moreno, Jr., that Juan Manuel Marquez-Rodriguez would engage in conduct that would constitute said offense, to wit: use a deadly weapon to abduct Julian Adrian Serrano and Juan Manuel Marquez-Rodriguez performed an overt act in pursuance of said agreement, to-wit: shot Julian Adrian Serrano with a firearm.

An aggravated kidnapping is committed if a person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense. TEX. PENAL CODE ANN. § 20.04(b), (c) (Vernon 2003) (first degree felony). Thus, Barrera was charged with

conspiracy as a second degree felony. *Id.* § 15.02(d). The indictment factually alleged that Barrera entered into an agreement that Marquez-Rodriguez ( a/k/a "Pugs") would commit a kidnapping by using a deadly weapon, and Pugs committed an overt act in pursuance of the agreement by shooting Serrano, the victim.[4]

***Corroboration of Accomplice Witness Testimony***

As persons who participated before, during or after the commission of the crime, Navarro and Sixto were accomplices as a matter of law, and the jury was so instructed. *See Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); *Williams v. State*, 995 S.W.2d 754, 759 (Tex. App.—San Antonio 1999, no pet.). Article 38.14 of the Code of Criminal Procedure provides a conviction cannot be upheld on the basis of accomplice testimony unless it is corroborated by "other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). The corroborating evidence is not sufficient if it merely proves the commission of the offense. *Id.*; *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). In reviewing the sufficiency of the corroborating evidence, we eliminate the accomplice testimony from consideration and focus on the remaining portions of the record to determine whether there is any evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey*, 992 S.W.2d at 462-63 (appellate courts should

---

[4] One of Barrera's arguments is that Pugs's act of shooting Serrano cannot constitute an act "in pursuance of" the agreement to kidnap because it resulted in Serrano's death and the plan was to abduct him alive. The testimony showed that Pugs shot Serrano once in the back to prevent him from fleeing and escaping the kidnapping; there was no evidence that Pugs intended to kill Serrano when he shot him. A person is held criminally responsible for causing a result "if the only difference between what actually occurred and what he desired . . . is that . . . a different offense was committed." TEX. PENAL CODE ANN. § 6.04(b)(1) (Vernon 2003). Here, in the course of committing a kidnapping using a deadly weapon Pugs shot the victim, resulting in his death–a foreseeable escalation of the original offense. *See Gordon v. State*, 640 S.W.2d 743, 758 (Tex. App.—San Antonio 1982, no pet.), *abrogated on other grounds by Reed v. State*, 744 S.W.2d 112, 125 n.10 (Tex. Crim. App. 1988).

not apply legal and factual sufficiency standard to statutorily based review of accomplice-witness testimony). The corroborating evidence may be direct or circumstantial, and need not be sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). A defendant's mere presence at the scene of the crime is by itself insufficient corroboration; however, presence combined with other suspicious circumstances may be enough to tend to connect the defendant. *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992); *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). Similarly, evidence the defendant was in the presence of the accomplice at or near the time or place of the offense is proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997).

Looking to the non-accomplice evidence in the record, there was documentary evidence presented through Corporal John Hill that Barrera, as well as several of the other co-conspirators (Campos, Pugs, Munoz, Sixto and Rudy), were all self-declared members of the Texas Syndicate gang. This evidence corroborated the testimony by both accomplices that Barrera was a member of the Texas Syndicate, and that several of the other co-conspirators were members of the gang as well. Detective Robert Garcia testified that he analyzed the contact list and phone records from Pequeno's Nextel boost phone seized by the F.B.I. Garcia's analysis of the phone records from Pequeno's phone around December 20 and 21, 2006 showed frequent calls to a contact listed as "the 36-year old virgin." Garcia was able to independently determine that such number belonged to Tomas Barrera by tracking calls made to his residence. This corroborated Sixto's testimony about Barrera's nickname and telephone number. Garcia also confirmed that the same number attributed to Barrera

appeared as contact "#1" on Chuy Campos's contact list. Garcia obtained the phone records for the other co-conspirators' numbers and cross-referenced them with each other, which revealed a pattern of frequent communications among the group, including with Barrera, on the day of the kidnapping. In particular, the records confirm Sixto's testimony that he called Barrera after Serrano was shot to report the result. These phone records corroborate both accomplices' testimony that the participants were in frequent communication with each other through their boost phones during the kidnapping efforts on December 20-21, 2006. In addition, the physical evidence at the scene of Serrano's murder also corroborated the accomplices' version of the events–a .40 caliber bullet was recovered, which matches the .40 caliber firearm that Navarro said Pugs was carrying; a small baggie of marihuana was found near the front door, which corroborates Navarro's description of the plan for Pugs to offer Serrano marihuana; and Serrano was shot once in the back and his body was found near the front door, corroborating the accomplices's version of the events.

The non-accomplice evidence detailed above sufficiently corroborates the accomplice witnesses's testimony. The phone records showing frequent co-conspirator calls to Barrera's phone on December 20-21, 2006 during the time-frame of the kidnapping, and his self-declared membership in the Texas Syndicate, link Barrera to the conspiracy to kidnap Serrano. While not alone sufficient to establish Barrera's guilt, the combined weight of the non-accomplice evidence sufficiently "tends to connect" Barrera to the offense. *Gosch*, 829 S.W.2d at 777. Accordingly, the accomplice evidence may be considered in the sufficiency analysis below.[5]

---

[5] Barrera does not raise a specific challenge to corroboration of the accomplice testimony under his conviction for engaging in organized criminal activity, but the same non-accomplice evidence would also tend to connect Barrera to the commission of that offense as well.

***Legal & Factual Sufficiency – Elements of Conspiracy***

In reviewing legal sufficiency, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). It is the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton*, 235 S.W.3d at 778; *see Mosley v. State*, 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998) (jury is sole judge of the credibility of the witnesses and the weight to be given their testimony). As the reviewing court, we must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton*, 235 S.W.3d at 778 (quoting *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). We resolve any inconsistencies in the testimony, and any conflicting inferences, in favor of the verdict. *Id.*; *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). In reviewing factual sufficiency, we consider all the evidence in a neutral light, giving almost complete deference to the jury's determinations of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will reverse the conviction only if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust, or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence. *Id.*; *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

Having already detailed the non-accomplice evidence, we now review that evidence along with the trial testimony provided by the two accomplice witnesses. One accomplice witness,

Navarro, testified he went to Munoz's house on December 20, 2006, and there were several members of the Texas Syndicate already there; he himself is not a member. Navarro identified those present as Pugs, Tejada, Campos, Moreno, Whiskey, Pequeno, Sixto, and Tomas Barrera; all except Whiskey, Moreno, and Tejada were known members of the Texas Syndicate. Navarro testified that he knew Barrera was the leader of the Laredo cell of the Texas Syndicate based on his prior conversations with Munoz, and his observations of how everyone paid Barrera respect that night. Navarro stated that when he arrived the plan on how they were going to kidnap Serrano "with violence" and drive him over alive to Nuevo Laredo was already decided. As Barrera watched, Navarro was instructed on his role in the kidnapping by Campos. Barrera was "orchestrating" what they were supposed to do, but did not himself instruct Navarro. On the first attempt to kidnap Serrano, during the daylight, the participants drove over to Serrano's trailer in three vehicles – Barrera accompanied Moreno in a red Ford truck. They were in communication with each other using their Nextel boost phones. When it appeared Serrano was not at home, they decided to postpone the kidnapping. Barrera, Moreno, Campos and Pequeno left, and the others returned to Munoz's house; it was still daylight. Later, when it was dark, the remaining participants at Munoz's house decided to go to Serrano's trailer and try again to kidnap him. Navarro, Pugs, Sanchez-Nunez, and Munoz rode together in a blue Chevy truck. Sixto, who had arrived after the first kidnapping attempt, drove along in another vehicle, a Chevy Lumina. Several of them were armed with weapons; Pugs had a .40 caliber firearm. On this second attempt, the plan was for Pugs, who knew Serrano, to knock on the door and try to lure Serrano out by offering to sell him some marihuana in a little baggie. When they arrived, the front door to the trailer was open and Pugs approached; Serrano came out and shook Pugs's hand, at the same time the other participants began approaching;

Serrano saw them, turned and ran back inside; Pugs shot Serrano once; then they all jumped back in the truck and fled back to Munoz's house. When they got there, Barrera was not there. Navarro heard a voice on the radio phone yelling at Munoz, "You always screw up – screw me up." Navarro stated he did not know whose voice was speaking.

The other accomplice witness, Sixto, testified that he went to Munoz's house to hang out and drink on the night of December 20, 2006; he was driving a Chevy Lumina. When he arrived, the guys already there were talking about a kidnapping. Those present were Pugs, Campos, Whiskey, Pelon, Munoz, and Pequeno. He was not initially involved in the plan to kidnap Serrano but was asked by Campos to help by acting as a lookout. Sixto drove his Chevy Lumina to Serrano's trailer during the second kidnapping effort and confirmed the sequence of events testified to by Navarro. Sixto stated that he had heard the kidnapping of Serrano was for the Zetas and Campos had contact with a known Zeta, "La Mona." Sixto admitted being a member of the Texas Syndicate and identified Tomas Barrera as the head or "sillon," of the Texas Syndicate in Laredo, with Campos, Munoz, himself and Pugs being "soldiers" in the organization. Sixto testified that all contracts such as the kidnapping of Serrano have to be approved by the sillon. Sixto identified the phone number for Barrera's boost phone and also his nickname as the "36-year old virgin" which was listed on the contact list taken by Detective Garcia from Pequeno's phone. Barrera was also known as "Tom-Cat." When Sixto returned to Munoz's house after the shooting of Serrano, Sixto himself called Barrera to "let him know that the deal went wrong." When asked why he called Barrera, Sixto replied, "Because he was – he's the one in charge here. I let him know what happened because – because afterwards if something goes wrong he has to let the other guys know what happened."

Finally, Sixto stated that once the "sillon" approves a plan, and knows "what is going to happen and how many soldiers are going," he does not have to actually participate in carrying it out.

The evidence that Barrera was present with the other co-conspirators at Munoz's house during the planning and instructions for the kidnapping, and stood by watching as Campos instructed Navarro on his role in the kidnapping, along with the evidence that Barrera participated in the first kidnapping attempt and was called immediately after the second kidnapping ended in the shooting of Serrano, all goes to prove that Barrera had agreed with the participants that they would commit the aggravated kidnapping. The phone records independently confirm Barrera and the other co-conspirators were in frequent communication on the day and evening of the kidnapping, and that Sixto called Barrera right after the shooting of Serrano. An overt act in pursuance of the agreement was performed by Pugs when he shot Serrano to prevent him from escaping during the course of the kidnapping. Use of a deadly weapon was clearly planned and anticipated. The evidence in support of the jury's verdict is clearly more than a scintilla, and is not "so weak" that the verdict is clearly wrong and manifestly unjust. The only conflicting evidence in the record is the testimony by Moreno's sister and attorney that he was on an electronic monitor in December 2006 which required him to be at home in the evenings, and he never had a violation report. This evidence went to Navarro's credibility since he had testified that Moreno participated in the kidnapping. A close look at Navarro's testimony, however, shows he testified only that Moreno participated in the daylight kidnapping attempt, and then left and did not return to Munoz's house; Moreno was not present for the night-time kidnapping that resulted in Serrano's death. Therefore, the verdict is not outweighed by the great weight of any conflicting evidence.

We conclude the evidence is legally and factually sufficient to support Barrera's conviction of the conspiracy to commit aggravated kidnapping.

### ENGAGING IN ORGANIZED CRIMINAL ACTIVITY

Barrera also argues the trial evidence was legally and factually insufficient to support his conviction of engaging in organized criminal activity. Specifically, Barrera contends the evidence did not establish a series of criminal acts by the group sufficient to prove a "combination," and the evidence did not establish an overt act by Barrera himself as required for this offense, as opposed to the conspiracy.

As noted, *supra*, there two main elements of engaging in organized criminal activity as applicable to this case:

> (1) intent to establish, maintain, or participate in a combination, or profits of a combination, **or** as a member of a criminal street gang; and
> (2) the person commits **or** conspires to commit aggravated kidnapping.

TEX. PENAL CODE ANN. § 71.02(a). There are two alternate means of committing the second element: actually committing the underlying offense, or conspiring to commit the underlying offense. *Id.* To be convicted under the second means, "conspiring to commit," the evidence must establish that: (i) the defendant agreed with one or more persons that one or more of them engage in conduct that would constitute the underlying offense, **and** (ii) the defendant, **and** (iii) one or more of them perform an overt act in pursuance of the agreement. *Id.* § 71.01(b). Thus, to establish the offense of engaging in organized criminal activity through a conspiracy, the State must prove an overt act in pursuance of the agreement by *both* the defendant and one or more members of the conspiracy. *Id.*; *McIntosh v. State*, 52 S.W.3d 196, 199 (Tex. Crim. App. 2001).

Here, Count III of the amended indictment charged Barrera with engaging in organized criminal activity through "conspiring to commit" aggravated kidnapping by alleging:

> [O]n or about the 21st day of December A.D. 2006 . . . Tomas Barrera . . . did then and there, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, said combination consisting of the defendant(s), who collaborated in carrying on the hereinafter described criminal activity **or** as a member of a criminal street gang, **conspire to commit** the offense of aggravated kidnapping by agreeing with each other that Juan Manuel Marquez-Rodriguez would engage in conduct that constituted said offense, **and** the defendant(s) acting with the intent to promote or assist the commission of the offense of aggravated kidnapping by soliciting, encouraging, directing, aiding or attempting to aid the other person to commit the offense of aggravated kidnapping **and** Juan Manuel Marquez-Rodriguez performed an overt act in pursuance of said agreement, to-wit: shot Julian Adrian Serrano with a firearm. (emphasis added).

The indictment alleged the requisite two overt acts in pursuance of the agreement were committed by: (i) Marquez-Rodriguez (a/k/a/ "Pugs") by shooting Serrano, and (ii) Barrera by soliciting, encouraging, directing, or aiding in the commission of the aggravated kidnapping. TEX. PENAL CODE ANN. § 71.01(b).

### Legal and Factual Sufficiency of the Evidence

Applying the same sufficiency standards discussed above, we will analyze whether there is sufficient evidence to establish each element of the offense as charged in the amended indictment.

#### 1. Participation in Combination or Criminal Street Gang

Under the first main element, as alleged in the indictment, the State had to prove that Barrera intended to "establish, maintain, or participate in" *either* a combination *or* a criminal street gang. The statutory definition of a "combination" is three or more persons who collaborate in carrying on criminal activities. TEX. PENAL CODE ANN. § 71.01(a) (Vernon 2003). The phrase "collaborate in carrying on criminal activities" means the members of the group of three or more "intend to work

together in a continuing course of criminal activities. *Nguyen v. State*, 1 S.W.3d 694, 696-97 (Tex. Crim. App. 1999) (phrase implies continuity, and is not satisfied by joint commission of a single crime); *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002). The acts which establish the "combination" element need not be criminal offenses in themselves. *Nguyen,* 1 S.W.3d at 697. A "criminal street gang" is defined as three or more persons who have a common identifying sign or symbol, or an identifiable leadership, who continuously or regularly associate in the commission of criminal activities. TEX. PENAL CODE ANN. § 71.01(d) (Vernon 2003). Membership in a criminal street gang may be established by the display of tattoos or other symbols representing gang membership. *See Garza*, 213 S.W.3d at 347 (court did not abuse its discretion or violate defendant's Fifth Amendment rights by requiring him to display his tattoos to jury in prosecution for engaging in organized criminal activity because tattoos established element of his participation in a "criminal street gang.").

As to whether the State proved Barrera's participation in a combination or criminal gang, the record contains documentary evidence that he was a self-declared member of the Texas Syndicate – at a minimum, a well-established criminal gang. There was detailed testimony describing the organization of the Texas Syndicate as similar to a corporation, with a clear hierarchy and a constitution or set of rules. Photographic evidence showed that Barrera and most of the co-conspirators bore tattoos representing their membership in the Texas Syndicate. There was also testimony that not only was Barrera a member of the Texas Syndicate, he was the leader, called the "sillon" or chair, of the Laredo cell. As to whether there was evidence that the Texas Syndicate engages in a "continuing course of criminal activities," the Nextel phones that contained contact listings, by nickname, for Barrera, Campos, Sixto, Pugs, and other self-declared members of the

Syndicate, were confiscated during a drug trafficking arrest in a nearby county, Sixto testified he was in federal prison because he pled guilty to committing a murder in Dallas on the orders of the Texas Syndicate, and Detective Garcia stated Navarro had given information about his participation in several other crimes besides Serrano's murder. Barrera's membership in the Texas Syndicate, a criminal street gang, was clearly established; therefore, it was not necessary for the State to also prove the existence of a combination.

### 2. Conspiring to Commit Aggravated Kidnapping

As noted, *supra*, under the means of engaging in organized crime by "conspiring to commit" a felony, the State had to establish three elements: (i) the defendant agreed with one or more persons that one or more of them engage in conduct that would constitute the underlying offense, **and** (ii) the defendant, **and** (iii) one or more of them performed an overt act in pursuance of the agreement. TEX. PENAL CODE ANN. § 71.01(b) (emphasis added). The evidence proving the agreement between Barrera and the other participants to commit an aggravated kidnapping, as well as the overt act committed by Pugs, was discussed above under Conspiracy and applies here as well. Therefore, this discussion will focus on the remaining element – the overt act by Barrera himself.

### Overt Act by Defendant Through Party Liability

With respect to the element requiring an overt act by the defendant himself, it is well established that the overt act need not be criminal in itself. *Barber*, 764 S.W.2d at 235. Acts that promote or solicit an offense, and thus amount to liability as a party, may be used to meet the overt act element for organized criminal activity. *Otto*, 95 S.W.3d at 284 (holding the law of parties is

applicable to prosecution for organized criminal activity). In holding the law of parties[6] is applicable, the Court reasoned that "[b]ecause the 'overt act' element of organized criminal activity need not be criminal in itself, acts that suffice for party liability–those that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense–would also satisfy the overt act element of section 71.02." *Id.* (citing *Barber*, 764 S.W.2d at 235). In *Otto*, the appellants were the leaders of the Republic of Texas, an organization that functioned as a combination, and planned an aggravated kidnapping of residents who had reported their activities to law enforcement. *Otto*, 95 S.W.3d at 283. The evidence showed that, although not present during the kidnapping, the appellants planned the kidnapping, and were in radio contact with the abductors during the kidnapping, and helped negotiate the release of the victims. *Id.* at 284. The Court noted the appellants' position as leaders of the combination and held that "their involvement in the planning, execution and aftermath of the kidnapping was tantamount to encouraging, directing, aiding, or attempting to aid in the offense, and therefore, it authorized a conviction under the law of parties." *Id.* at 285; *see Barber*, 764 S.W.2d at 235 n. 1 (noting that a "ring leader" may be found guilty of engaging in organized criminal activity under section 71.02(a) based on evidence that he "(1) intended to participate in a criminal combination, and (2) performed the overt act of soliciting and organizing others in furtherance of the combination . . .").

Similarly, here the evidence established that Barrera was the leader of the Texas Syndicate in Laredo, and there was accomplice testimony that as the "sillon" he would have had to approve the plan to commit the aggravated kidnapping. Other testimony showed Barrera was present at the

---

[6] *See* TEX. PENAL CODE ANN. § 7.01 (party liability), § 7.02(a)(2) (person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense).

Munoz house during the planning, and listened while Navarro was instructed on what to do. In addition, Barrera accompanied the other participants on the first trip to the victim's home and received a call reporting the shooting after the kidnapping went awry that night. Testimony and the phone records on the day of the kidnapping also prove Barrera was in communication with the other participants around the time the offense was committed – particularly important is the phone record confirming Sixto's testimony that he called Barrera shortly after the shooting because Barrera was in charge. This evidence is legally and factually sufficient to establish that Barrera committed an overt because he intended to promote or assist the commission of the aggravated kidnapping and "encouraged, directed, aided, or attempted to aid" in the commission of the offense; therefore, it authorizes Barrera's conviction under the law of parties. *Otto*, 95 S.W.3d at 285; *Barber*, 764 S.W.2d at 235 n. 1 ("ring leader" may be found guilty of engaging in organized criminal activity through law of parties).

Relying on *McIntosh v. State*, Barrera argues that party liability requires the State to prove that the underlying offense was actually committed, and it failed to do so here because Serrano was murdered, not kidnapped. *See McIntosh*, 52 S.W.3d at 200-01 (party liability can support conviction for engaging in organized criminal activity when the offense is alleged and proved as commission of the underlying offense). Barrera misapplies *McIntosh*. The defendant there was charged with engaging in organized criminal activity by himself committing the underlying offense, compelling prostitution. *Id.* at 199. The court discussed the difference between the two means of engaging in organized criminal activity, noting that under the "conspiring to commit" means, "a conspirator is punished because of the agreement to commit an offense with *no requirement* that the object offense *actually be committed*." *Id.* at 200. In reasoning that for party liability to apply to McIntosh, the

offense of compelling prostitution had to have been actually committed, the court explained, "[a] party is criminally responsible for the offense *committed* by another because of the party's own solicitation, encouragement, aid, or direction. The party is responsible for the conduct of another because of his level of participation in the offense, even if he was not the proverbial triggerman." *Id.* at 200-01 (the party is liable for the conduct of the principal). The court did not state that party liability could not be applied to the alternate means of "conspiring to commit" the underlying offense, and indeed that theory was applied in *Otto*, a later case. *Id.* at 201; *Otto*, 95 S.W.3d at 285.

Based on our review of the record and applicable law, we conclude the evidence is legally and factually sufficient to support Barrera's conviction for engaging in organized criminal activity by "conspiring to commit" aggravated kidnapping.

### JURY CHARGE

In addition, Barrera argues the jury's verdict is void because the jury charge mixed up the count numbers for the two offenses. He contends the misnumbering of the counts was confusing to the jury and deprived him of due process.

The jury charge on guilt/innocence stated the correct law as to each offense and correctly instructed the jury in the application portions, without referring to the count numbers. The verdict forms, however, misnumber the offenses, incorrectly referring to engaging in organized criminal activity as Count II and conspiracy as Count III. As noted, the jury found Barrera guilty on both offenses, and the verdict forms indicate the findings of guilt as to both offenses by name and degree of felony. The court's charge on punishment and the judgment carry forward the clerical error of misnumbering the counts; however, the charge applies the correct punishment range to the correct offense and does not otherwise misstate the law. In returning its verdict on punishment, the jury

recommended a sentence and fine within the appropriate range for each offense. The misnumbering of the counts did not reflect judicial reasoning, but was merely a clerical error. The clerical error of misnumbering the counts had no substantive effect on the jury's findings, and did not affect Barrera's substantial rights or deny him due process. Accordingly, we overrule his issues on appeal. The trial court's judgment should, however, be reformed to reflect that Count II is the conspiracy conviction and Count III is the engaging in organized criminal activity conviction. *See* TEX. R. APP. P. 43.2(b); *Banks v. State*, 708 S.W.2d 460, 462 (Tex. Crim. App. 1986) (court of appeals may reform the judgment to correct an obvious clerical error when it has the necessary data before it); *Knight v. State*, 581 S.W.2d 692, 694 (Tex. Crim. App. [Panel Op.] 1979) (judgment reformed to reflect correct offense).

## PROSECUTORIAL REMARKS/MISTRIAL

Barrera contends that questions and argument by the prosecutor implied that Barrera would have the State's witnesses killed for testifying against him, thereby prejudicing him and depriving him of a fair trial. The State responds that the prosecutor was simply seeking to rebut the defensive theory that the testimony of the two accomplice witnesses had been "bought" by the government, and they were not being truthful. Barrera's objections were sustained in both instances he cites, and he moved for a mistrial on each occasion. Therefore, his proper complaint on appeal is that his motion for mistrial was denied.

### *Standard of Review*

When a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). Only in extreme

circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required. *Id.* In determining whether a trial court abused its discretion in denying a mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Id.* at 77.

*Analysis*

Barrera cites two specific instances in his brief. The first involves the following question posed by the State to the accomplice witness Navarro: "Is it – do you– do you know if there is any danger to you for testifying in court right now?" Defense counsel initially objected and moved for a mistrial on lack of relevance. After a lengthy discussion and voir dire of the witness outside the jury's presence, Barrera raised additional objections based on prosecutorial misconduct, inadmissible extraneous offense evidence of retaliation/threatening a witness, and undue prejudice under Rule 403 based on the inference that the danger came from Barrera. The State's position was that it was merely a broad question referring to any danger from a gang member, not specifically from Barrera. The State also argued it was a permissible question to rebut the implication raised by Barrera's cross-examination and opening argument that Navarro's motivation to testify was to "save his own neck." The State argued it was entitled to rebut that defensive theory with evidence that Navarro was placing himself in danger of retaliation from the Texas Syndicate, or from any prison gang member, by choosing to testify and cooperate with the government. Navarro testified on voir dire, outside the jury's presence, that he thought he could lose his life for "testifying against someone that is in jail," but that he had not been directly threatened in prison or threatened by Barrera. The prosecutor represented to the court that the Bureau of Prisons was in the process of relocating Navarro because

he is in danger. The State also argued that any prejudice was outweighed by the importance of Navarro's credibility as one of two accomplice witnesses. After a break, the trial court sustained Barrera's objection to the prosecutor's question and instructed the jury to disregard the question; no response was given by the witness. Barrera's request for a mistrial was denied.

The second instance pointed out by Barrera occurred during the State's closing argument. In talking about the two accomplice witnesses' testimony, the prosecutor stated that Navarro is "now labeled as a snitch and he has a target and a price on his head and he will be looking over his shoulder for the rest of his life. Sounds like a great deal." As to Sixto, the prosecutor argued, "Sixto Salinas already was a wanted man before he testified here today. He had nothing to lose. The only thing he had to gain was protection while he serves out his time. This man also is forever a target. It doesn't end here for those two guys. Their family and themselves will constantly be targets." At that point, defense counsel objected to the comments as improper argument, inflammatory and prejudicial. He moved for an instruction, and the court instructed the jury that what the lawyers say is not evidence and they are the sole judges of the facts. Barrera also moved for a mistrial, which was denied.

Here, the prosecutor's question and comments about the danger to the two accomplice witnesses were not specifically directed at Tomas Barrera, although an inference could certainly be made. There was evidence that any member of a gang who chooses to testify against a fellow member risks retaliation by the gang, or even a member of a different gang, simply for being a "snitch" and cooperating with the government. Even if the prosecutor's question and statements were improper, the denial of Barrera's requests for a mistrial is not reversible error. There was no answer given to the particular question asked of Navarro, and the court instructed the jury to

disregard the question. Likewise, the court gave a curative instruction after sustaining Barrera's objection during the State's closing argument. Absent evidence to the contrary, we presume that the jury followed the instruction to disregard. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (any harm caused by improper question and answer is ordinarily cured by an instruction to disregard); *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999) (jury is presumed to follow trial court's instruction to disregard). Barrera points out only two isolated instances of comments concerning the danger to the testifying witnesses, and neither was directly tied to Barrera himself. Considering the potential prejudicial effect, the curative measures taken by the court, and the degree of certainty of conviction absent the comments, the trial court did not abuse its discretion by denying a mistrial. *Hawkins*, 135 S.W.3d at 77.

### ADMISSION OF EVIDENCE

Finally, Barrera challenges the admission of various testimony that he asserts was not based on personal knowledge of the witnesses, but was merely "assumptions, conjecture, hearsay, and unfound opinions." Most of the hearsay was statements made by co-conspirators during the course of the conspiracy and was thus admissible. TEX. R. EVID. 801(e)(2)(E). Other challenged testimony was cumulative of other evidence admitted without objection. The trial court did not abuse its discretion in admitting the challenged evidence. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Even if error was committed, Barrera has not shown that his substantial rights were prejudiced. *See* TEX. R. APP. P. 44.2(b); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

CONCLUSION

Based on the foregoing analysis, we overrule all of Barrera's issues on appeal. Because the judgment misstates the count numbers attributable to the offenses of conviction, we reform the judgment to reflect that Count II is the second degree felony offense of criminal conspiracy for which a 15-year sentence was assessed, and Count III is the first degree felony offense of engaging in organized criminal activity for which a 55-year sentence was assessed. The trial court's judgment is affirmed as reformed.


Phylis J. Speedlin, Justice

PUBLISH