

# IN THE
# TENTH COURT OF APPEALS

### No. 10-19-00110-CR
### No. 10-19-00111-CR

**CHARLES W. DEFOREST,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 12th District Court
Madison County, Texas
Trial Court Nos. 17-12834 & 17-12838**

## MEMORANDUM OPINION

In trial court cause number 12,834, the jury found Charles W. Deforest, Appellant, guilty of the state jail felony offense of theft between $2,500 and $30,000. The same jury also found Appellant guilty, in trial court cause number 12,838, of the offense of engaging in organized criminal activity. The trial court assessed punishment for the theft conviction at confinement for two years and, after it found two enhancement paragraphs

to be true in the engaging in organized criminal activity case, assessed punishment at confinement for forty years. The trial court sentenced Appellant in accordance with its assessment of punishment. We modify the judgment in trial court cause number 12,834, the theft case, to delete the assessment of costs but otherwise affirm that judgment. We affirm the judgment in trial court cause number 12,838, the engaging in organized criminal activity case.

Appellant has filed the same brief in each of these appeals. Likewise, the State has responded with the same brief in each appeal. However, not all issues on appeal are relevant to both appeals.

With that in mind, we will first dispose of Appellant's fourth issue on appeal. In the fourth issue, Appellant addresses only the theft conviction. Appellant maintains that the trial court erred when it assessed costs and fees against him in both judgments. The State agrees, and so do we.

The Texas Code of Criminal Procedure provides: "In a single criminal action in which a defendant is convicted of two or more offenses or of multiple counts of the same offense, the court may assess each court cost or fee only once against the defendant." TEX. CODE CRIM. PROC. ANN. art. 102.073 (West). The costs or fees assessed are to be "assessed using the highest category of offense that is possible based on the defendant's convictions." *Id*. at (b). This court has previously held that in cases in which allegations and evidence of more than one offense are presented in a single trial, a trial court errs if

it assesses costs in each conviction. *Hurlburt v. State*, 506 S.W.3d 199, 203–04 (Tex. App.—Waco 2016, no pet.). We modify the judgment in the theft case (trial court cause number 17-12834) to delete the assessment of costs and fees. Otherwise, we affirm that judgment.

In the three issues that remain, Appellant addresses only his conviction for engaging in organized criminal activity.

In his first issue on appeal, Appellant contends that, although the evidence is sufficient to prove theft under the law of parties, the evidence is insufficient to show that Appellant conspired, before the theft, to aid in the commission of the offense. Appellant asserts that the only evidence offered at trial related to his involvement after the thefts were completed.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When we conduct a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim.

App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. The jury, as the trier of fact, "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

Billy Ray Fannin, Jr. met John Wayne Keefer when they were both in county jail. Fannin testified that Keefer told him that if he ever needed anything, to let him know. Later, on April 9, 2017, Fannin contacted Keefer at Keefer's trailer. Fannin intended to steal some things and asked Keefer whether he would buy the stolen items. Appellant and Melissa Tedford (Keefer's girlfriend) were present during this conversation. Appellant lived with Keefer. Fannin testified that they struck a deal that he would steal property and that Appellant, Keefer, and Tedford would buy it.

After Fannin had that conversation with Appellant, Keefer, and Tedford, he and a juvenile, Tyler, returned to a place where they had been fishing earlier in the day and "grabbed some weed eaters and chain saws." They took the stolen items to Keefer's house and "got a price for it." Appellant was present during this transaction.

Fannin and Tyler then went to some property owned by Justin Lee. Lee owned a landscaping company. Fannin had worked for him until about three weeks or so earlier; Lee had fired him because he was a bad employee.

Lee kept the tools of his landscaping trade in a workshop on his property. The shop was situated on the inside so that operable tools were segregated from the inoperable ones that needed to be repaired.

When Fannin and Tyler arrived at Lee's property, they jumped the fence, and stole some landscaping equipment; they took only that equipment that was operable. They again took the stolen property to Appellant, Keefer, and Tedford and "got a price on it."

There was also a Kawasaki Mule on Lee's property. Although the Mule was titled in Lee's brother's name, the Mule had been given to Lee's brother's eleven-year-old autistic son as a gift.

When Fannin took the landscaping equipment to Appellant, Keefer, and Tedford, he told them that he could steal the Kawasaki Mule and bring it to them. Appellant, Keefer, and Tedford were present during all or a part of the conversation. Fannin, Tyler, and Fannin's little sister, Ammie, went back to Lee's property to get the Mule. As Fannin, Tyler, and Ammie traveled back to Lee's property, Appellant, Keefer, and Tedford followed them. Eventually, Appellant, Keefer, and Tedford stopped following them. The plan was that they would all meet on another road close to Lee's property after Fannin,

Tyler, and Ammie had the Mule; Appellant, Keefer, and Tedford were to then take the Mule.

Fannin and Tyler got the Mule and met Appellant, Keefer, and Tedford as previously arranged. Appellant, Keefer, Tyler, and Tedford tried to load the Mule into the pickup that Appellant, Keefer, and Tedford were in; they were unsuccessful. They decided to hide the Mule in a pasture until they could get a trailer and return for it the next day.

As they were in the process of hiding the Mule, they noticed lights from an approaching vehicle and the parties scattered. Appellant stayed with the Mule during the night until the others returned with a trailer.

Meanwhile, Fannin and Tyler went to another location to steal some more property. At this point, Fannin and Tyler locked themselves out of the Suburban that they were driving.

At around 4:30 a.m. on April 10, 2017, Fannin called Curtis Klingle, a deputy with the Madison County sheriff's office. Fannin was one of many young people that Deputy Klingle had mentored over the years. Fannin asked Deputy Klingle to help him unlock the Suburban. Deputy Klingle tried but was not able to gain access to the vehicle.

When the parties went to load the Mule, they discovered that Tyler had apparently taken the key to the Mule with him when they all scattered; they had to push it onto the trailer. After they loaded the Mule, Appellant, Fannin, Keefer, and Tedford took it to a

self-storage facility in Flynn. Appellant rented and signed the paperwork to rent—in his name—a self-storage unit there. The Mule was later located in that self-storage unit that had been rented by Appellant.

When Lee's employees came to work around 8:00 a.m. on April 10, 2017, they noticed that operable "gear" was not in the shop where it was normally kept; they reported that to Lee. Lee noted that a chain saw, a hedge trimmer, two trimmers, two backpack blowers, a Kombimotor, and a DeWalt generator were missing. A 2011 Kawasaki Mule was also missing.

Lee reported the theft to the Madison County sheriff's office and Deputy Klingle responded. Lee furnished the serial numbers and descriptions of the missing property to Deputy Klingle. Lee also told Deputy Klingle that he had fired Fannin earlier.

When Lee told Deputy Klingle about firing Fannin, Deputy Klingle became suspicious and surmised that Fannin was a suspect in the theft. Deputy Klingle arranged for Fannin's sister, the owner of the Suburban that he had tried to unlock for Fannin earlier, to come and unlock it; she did. Inside, on the console, Deputy Klingle found a Kawasaki Mule key. It was later determined that it was the key to the stolen Mule.

Deputy Klingle asked Sergeant Larry Shiver, an investigator for the Madison County sheriff's office, to assist in the investigation. Sergeant Shiver used the LEADS system to check the serial numbers and descriptions of the items that had been stolen from Lee. LEADS online is a data base used by pawn shops, scrap yards and some gold

dealers, as well as law enforcement personnel, to track stolen property. Sergeant Shiver discovered that some of the property that had been stolen from Lee had been pawned at a pawn shop in Tomball.

Sergeant Shiver put a hold on the property and went to the pawn shop in Tomball. He recovered several of the items that had been stolen from Lee. Sergeant Shiver also viewed videos of the transaction as recorded by video equipment in the pawn shop. He recognized Keefer and Tedford and he also identified Appellant from the videos. The videos show Appellant and the pawn shop clerk as they moved Lee's generator into the pawn shop. The videos also show Appellant hand his ID to the clerk, the clerk return the ID to Appellant, the clerk hand cash to Appellant, Appellant sign a receipt for the cash, Appellant put the money into his wallet and, finally, put the wallet into his pocket.

Appellant contends that the evidence that we have outlined is insufficient to support a finding that he is guilty of the offense of engaging in organized criminal activity.

Section 71.02(a) of the Texas Penal Code provides, in relevant part: "A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination ... the person commits or conspires to commit ... theft." TEX. PENAL CODE ANN. § 71.02 (West). Under section 71.02, "the State must prove that the accused, with intent to establish, maintain, or participate in a

combination, committed or conspired to commit an enumerated offense, including [theft]." *McIntosh v. State*, 52 S.W.3d 196, 199 (Tex. Crim. App. 2001).

Section 71.02(a) provides two alternate means by which one commits the offense of engaging in organized criminal activity: by either committing the underlying offense or by conspiring to commit the underlying offense. *Barrera v. State*, 321 S.W.3d 137, 143 (Tex. App.—San Antonio 2010, pet. ref'd). In this case, the State charged Appellant with conspiring to commit the offense of theft.

Appellant maintains that the only evidence as to his involvement shows only his participation after the theft. The essence of Appellant's argument is that although the evidence is admittedly sufficient to prove his involvement as a party to the theft of the Mule, the evidence fails to show a "pre-theft agreement" and he could not, therefore, have conspired to commit the theft. Appellant argues that because the State relied on a "conspiring to commit" theft theory, the State must prove that Appellant agreed in advance to aid in the commission of the offense. We note that Appellant attacks no other element of the offense of engaging in organized crime.

In accordance with the standard of review that we have set forth, we view the evidence in the light most favorable to the verdict. We consider both direct and circumstantial evidence, as well as all reasonable inferences that may be drawn from the evidence, in making our determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Because direct evidence is rarely available to prove the existence of an

agreement, circumstantial evidence is sufficient and is almost always needed." *Nwosoucha v. State*, 325 S.W.3d 816, 831 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (quoting *Jarnigan v. State*, 57 S.W.3d 76, 87 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). It is within the province of the jury to infer an agreement among people who are pursuing a common project when the actions of each of those persons is consistent with the realization of the common goal. *Id.*

Each time that Fannin went to Keefer's house, where Appellant also lived, either to discuss the sale of stolen property or to deliver stolen property, Appellant was present. Appellant personally pawned much of the stolen property and put the money in his pocket.

When Fannin went to Keefer's house to discuss the theft of the Kawasaki Mule, Appellant was there at that time also. After they had discussed the theft of the Mule, Appellant, Keefer, and Tedford followed Fannin, Tyler, and Ammie on the way to get the Mule. The plan was for Keefer and Appellant to meet Fannin, Tyler, and Ammie "down the road" to load the Mule in the back of a pickup. When they had to abandon that plan, they put the Mule in a pasture; Appellant stayed there in that pasture until the others returned the next day with a trailer. It was then that they were able to load the Mule. Appellant, Keefer, Fannin, and Tyler hauled the Mule to Flynn. There, they hid it in a storage building that Appellant leased.

Because we believe that the evidence is sufficient to support a finding that Appellant was guilty of the offense of engaging in organized criminal activity, as alleged in the indictment, we overrule Appellant's first issue on appeal.

In his second issue on appeal, Appellant contends that the application paragraph of the jury charge was incorrect. With no objection from Appellant, the trial court instructed the jury, in relevant part, as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about 9th, day of April 2017 and before the presentment of this indictment (sic), in Madison County and State of Texas CHARLES WILLIAM DEFOREST did then and there with the intent to establish, maintain, or participate in a combination or in the profits of a combination, said combination consisting of the defendant and Melissa Tedford and Billy Fannin and John Wayne Keefer and [Tyler], a juvenile, who collaborated or conspired to commit the offense of Theft of Property of a value of $2,500 or more but less than $30,000 then you will so say by your verdict "Guilty." Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

It is Appellant's position that when the trial court included the word "who" after "said combination consisting of the defendant and Melissa Tedford and Billy Fannin and John Wayne Keefer and [Tyler], a juvenile," rather than ask the jury whether Appellant "committed or conspired to commit" theft, the trial court effectively told the jury that Appellant and the others had collaborated or conspired to commit the offense of theft.

The instruction mirrors the indictment. It seems to us, and we so hold, that the language, "said combination consisting of the defendant and Melissa Tedford and Billy

Fannin and John Wayne Keefer and [Tyler], a juvenile," merely adds required information about or describes the constitution of the combination alleged by the State. We are of the opinion that a plain reading of the instruction leads to the conclusion that the trial court inquired of the jury whether Appellant was a member of the named combination and whether that combination conspired to commit the offense of theft; it did not inform the jury of the truth of that allegation.

Even if we are in error in our construction, we would not reverse the conviction. As we have said, Appellant did not object to the jury charge. Accordingly, we reverse the judgment only if any error resulted in egregious harm. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)).

Egregious harm is only shown when the error results in harm such that the accused did not receive a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. In Almanza, the Texas Court of Criminal Appeals outlined four factors that a reviewing court should

consider when determining whether a jury-charge error resulted in egregious harm: (1) the charge itself; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Villarreal*, 453 S.W.3d at 433.

We have opined on the charge itself and we have outlined the evidence presented at trial. Additionally, the State points out in its brief that the evidence showed that "other members of the combination . . . admitted to their participation in the . . . combination with Appellant." Based upon our consideration of the factors set out in *Villarreal*, we cannot conclude that Appellant suffered egregious harm that resulted from the complained-of instruction. We overrule Appellant's second issue on appeal.

In Appellant's third issue on appeal, he complains that the trial court erred when it admitted, over his objection, evidence of a conviction that differed from the enhancement allegation contained in the indictment. The indictment in the engaging in organized criminal activity case contained two enhancement paragraphs. In the first of those paragraphs, the State alleged a prior conviction for the felony offense of driving while intoxicated. In the enhancement paragraph, the State alleged that the offense occurred in Groesbeck County. Groesbeck is not a county but is a city within Limestone County.

At the punishment phase of trial, the State offered State's Exhibit 3, a certified copy of the judgment relative to the felony driving while intoxicated conviction. Appellant

objected to the admission of the exhibit because, since he had never been convicted in Groesbeck County, he was surprised. Appellant also objected that the enhancement was "not a proper enhancement." The remainder of Appellant's objection was directed at the second enhancement paragraph and that paragraph is not a subject of this appeal. The trial court overruled the objection. That ruling is the basis of Appellant's third issue on appeal.

The State points out that although Appellant, in his brief, states that he was misled by the fatal variance in the enhancement paragraph, he did not object in the trial court upon that ground. We agree. To the extent that his argument on appeal might be considered as a fatal variance argument, it is waived. *See Cole v. State*, 611 S.W.2d 79, 80 (Tex. Crim. App. 1981) (before the sufficiency of allegations in an enhancement paragraph may be challenged on appeal, the defendant must have moved, in the trial court, to quash the enhancement provision in the indictment).

The State maintains that Appellant could not have been surprised by the introduction of the evidence. That is so, the State argues, because on February 5, 2018, it furnished Appellant with a "Notice of Intent to Use Evidence of Extraneous Offenses or Bad Acts." The document contained the correct county designation, the correct cause number, and the correct designation of court in which the subject felony driving while intoxicated conviction occurred. Further, the State points out that the guilt/innocence portion of the trial of this case was not conducted until August 2018. At that time, the

State provided access to a copy of the Limestone County judgment to Appellant; the punishment phase of the trial was not begun until February 28, 2019.

Our review of a trial court's ruling on admissibility of evidence is for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). A trial court does not abuse its discretion unless its decision to admit evidence lies outside the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018)

Approximately one year before the punishment phase of the trial in this case began, Appellant had notice of the correct information relative to the felony driving while intoxicated conviction that the State intended to prove. Appellant also had the indictment that had been returned against him. However, no clarification or relief was sought from the trial court. We fail to see how Appellant could have been surprised. The trial court did not abuse its discretion when it overruled Appellant's claim of surprise and admitted State's Exhibit 3. We overrule Appellant's third issue on appeal.

We modify the judgment in trial court cause number 12,834 to delete the assessment of costs and fees. Otherwise, we affirm that judgment. We affirm the judgment in trial court cause number 12,838.

JIM R. WRIGHT
Senior Chief Justice

Before Chief Justice Gray,
    Justice Johnson, and
    Visiting Justice Wright[1]
Affirmed as modified
Opinion delivered and filed July 7, 2021
Do not publish
[CRPM]



---

[1] The Honorable Jim R. Wright, Senior Chief Justice (Retired) of the Eleventh Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.